MERRICK B. GARLAND
Attorney General
RANDY S. GROSSMAN
United States Attorney
MICHAEL G. WHEAT, CBN 118598
JOSEPH J.M. ORABONA, CBN 223317
JANAKI G. CHOPRA, CBN 272246
COLIN M. MCDONALD, CBN 286561
ANDREW Y. CHIANG, NYBN 4765012
Special Attorneys of the United States
880 Front Street, Room 6293
San Diego, CA 92101
619-546-8437/7951/8817/9144/8756
Michael.Wheat@usdoj.gov

Attorneys for the United States of America

## UNITED STATES DISTRICT COURT
### DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KEITH MITSUYOSHI KANESHIRO (1),<br>DENNIS KUNIYUKI MITSUNAGA (2),<br>TERRI ANN OTANI (3),<br>AARON SHUNICHI FUJII (4),<br>CHAD MICHAEL MCDONALD (5),<br>SHERI JEAN TANAKA (6),<br><br>Defendants. | CR No. 22-00048-JMS-WRP<br><br>UNITED STATES' RESPONSE AND OPPOSITION TO MOTION FOR PARTIAL DISMISSAL BASED ON STATUTE OF LIMITATIONS [ECF Nos. 120, 132, 140, 143, 148, and 149]<br><br>Date:   February 28, 2023<br>Time:   10:00 a.m.<br>Judge:  Hon. J. Michael Seabright |

I

## INTRODUCTION

The United States alleges and intends to prove that the defendants—

executives and agents of Mitsunaga & Associates (MAI)—banded together to form

a criminal partnership. Their aim: to exact retribution against L.J.M., who once worked alongside them but later became embroiled in a lawsuit against the company. The price of L.J.M's disloyalty, the defendants believed, demanded a criminal prosecution, in which their former colleague would be dragged through the ordeal of an arrest, bail, compelled court appearances, travel restrictions, substantial legal fees, and the threat of incarceration based on serious felony charges.

But there was a problem. Their claims against L.J.M. were petty at best, baseless at worst. So the MAI defendants cultivated an ally—the most powerful one their money could buy: defendant Keith Kaneshiro. By enticing Kaneshiro with bribes disguised as campaign contributions, the MAI defendants reeled the city's top prosecutor into their corner. And at MAI's behest, Kaneshiro agreed to file charges against L.J.M., pursuing them relentlessly, despite his own senior deputy's assessment (before being removed from the case) that L.J.M. committed no crimes.

After multiple years, the case against L.J.M. collapsed. The presiding judge, like the deputy prosecutor under Kaneshiro, found there was never any probable cause to support the criminal charges. The judge ultimately dismissed the case with prejudice, but not before issuing an extraordinary public rebuke of Kaneshiro and his office for behaving as a "conduit" for MAI's interests.

Now comes a motion to partially dismiss the First Superseding Indictment (FSI) based on the five year statute of limitations. It fails, because L.J.M. was still actively being prosecuted and in peril within the limitations period for the counts

2

charged in the FSI. Because conspiracies normally extend beyond the substantive offenses, and encompass the acts of conspirators to attain the payoff of their plotting, the motion has no merit. The "payoff" sought by the defendants is plainly set forth in the FSI. It was the prosecution itself—and the deprivations L.J.M. would suffer. Because the *prosecution* continued into the limitations period, the counts are timely.

## II

## BACKGROUND

Sheri Tanaka's motion to partially dismiss the FSI requires an overview of the relevant dates.[1] Because the defendants were indicted on June 2, 2022, the five year statute of limitations extends back to June 1, 2017.[2] See 18 U.S.C. § 3282(a). So if any of the conspiracies ended prior to June 1, 2017, it would be untimely and should not be maintained as a charge. But if the conspiracies extended past June 1, 2017, there is no dispute they would be timely. Which is the case?

The FSI answers that question. In particular, Paragraph 21(3) sets forth the *quid pro quo* agreement between the MAI defendants and Kaneshiro to purchase a criminal prosecution with bribes:

---

[1] Defendants Keith Kaneshiro, Dennis Mitsunaga, Chad McDonald, Terri Ann Otani, and Aaron Fujii, all join in Tanaka's motion to dismiss. See ECF Nos. 132, 140, 143, 148 and 149.

[2] Tanaka was charged by the FSI on September 8, 2022. She agrees, however, that the June 1, 2017 cutoff applies to her due to a tolling agreement she entered into with the United States. See Motion to Dismiss (MTD) at 14 n.2.

In exchange for the campaign contributions given to him by MITSUNAGA, OTANI, FUJII, MCDONALD, TANAKA, and others, KANESHIRO would agree to take official action and exercise his authority as the Prosecuting Attorney for the City and County of Honolulu to open an investigation into and prosecute former MAI employee L.J.M. The prosecution of L.J.M. continued until her case was dismissed with prejudice in a written order by Judge Karen T. Nakasone on September 15, 2017, and the time to appeal lapsed on or about October 15, 2017.

As this paragraph details, the prosecution did not formally terminate until October 15, 2017. The charges, therefore, are timely.

That is not all. Kaneshiro—through a subordinate—also engaged in affirmative prosecutorial acts within the limitations period. On June 13, 2017, a prosecutor acting for Kaneshiro filed a brief opposing L.J.M's motion to dismiss the charges against her. FSI ¶ 22(48). Next month, on July 24, 2017, the prosecutor, again acting for Kaneshiro, appeared in court to argue against the dismissal of the charges. FSI ¶ 22(49). After the case was dismissed, Kaneshiro directed the same prosecutor to appeal the order of dismissal. FSI ¶ 22(50). Thereafter, on September 25, 2017, the prosecutor, as he was instructed, produced an interoffice memorandum recommending that the office file an appeal. FSI ¶ 22(51). Each of these overt acts transpired *after* June 1, 2017, and further demonstrate the conspiracies are timely.

Tanaka moves to partially dismiss the FSI without accounting for these (inconvenient) facts. Instead, she urges the Court to fixate on several discrete events outside the limitations period with no regard to the overall scope of the conspiratorial agreement. First, Tanaka seeks dismissal of the conspiracies to commit federal

4

program bribery, because the last of the bribes were paid more than five years ago. Motion to Dismiss (MTD) at 14. Second, she urges dismissal of the conspiracy against rights "to the extent that the alleged conspirators agreed to seek L.J.M's arrest," because the arrest occurred outside of the limitations period. MTD at 18. Third, she contends the conspiracy against rights should further be dismissed "to the extent" it involves the imposition of cash bail, because "that conspiracy necessarily ended when the bond was set aside" in February 2015. MTD at 19. Finally, Tanaka requests dismissal of the conspiracy to commit honest services wire fraud "to the extent that it charges a conspiracy 'to open an investigation into L.J.M.,'" because that happened more than nine years ago. MTD at 16–17.

Her reasoning is mistaken. For the reasons below, Court should deny the motion in its entirety.

### III

### DISCUSSION

The central flaw of the motion to dismiss is its failure to adhere to the Supreme Court's directive that "the crucial question in determining whether the statute of limitations has run is *the scope of the conspiratorial agreement*[.]" *Grunewald v. United States*, 353 U.S. 391, 397 (1957) (emphasis added). Rather than focus on the scope of the conspiratorial agreement—which, as the United States alleges, was formed for the purpose of investigating and prosecuting L.J.M., and thrusting her into the criminal justice system—Tanaka plucks out individual events from outside

the limitations period and asks the Court to lop off the conspiracies there. The very premise of Tanaka's argument, however, is not supported in the law.

### A.   MOTIONS TO DISMISS UNDER RULE 12(B)

As an initial matter, Fed. R. Crim. P. 12(b)(1) allows a party to raise before trial "any defense, objection, or request that the court can determine without a trial on the merits." A statute of limitations bar could be raised before trial "if it involves questions of law rather than fact." *United States v. Nukida*, 8 F.3d 665, 669 (9th Cir. 1993) (internal quotations omitted). "But a Rule 12(b) motion to dismiss is not the proper way to raise a factual defense." *Id.* If the inquiry is "essentially factual," then it is "inappropriate for resolution on a pretrial motion[.]" *Id.* at 672.

Tanaka concedes it is the jury's job to "find that at least one overt act in furtherance of the conspiracy had occurred within the five-year period of limitations." MTD at 6; see *United States v. Fuchs*, 218 F.3d 957, 961 (9th Cir. 2000) (jury should have been instructed "to find that an overt act in furtherance of the conspiracy occurred within the statute of limitations"). Since Tanaka candidly agrees that her motion involves issues concerning the duration of the charged conspiracies based on the commission of overt acts, and these are questions for the jury to determine, her motion should be denied as premature.

Nonetheless, the United States does not rest on this reason alone. The motion also fails as a matter of law. The Court should therefore deny the motion on legal grounds in order to avoid the same issues in a future Rule 29 motion.

B.    THE CONSPIRACIES TO COMMIT FEDERAL PROGRAM
      BRIBERY DID NOT CEASE UPON PAYMENT OF THE
      BRIBES

Tanaka first contends that a conspiracy to commit federal program bribery, in violation of 18 U.S.C. § 666(a)(2) and (a)(1)(B), "ends on the day that the final corrupt payment is given, accepted or solicited." MTD at 3. In other words, she would have the statute of limitations for the conspiracy *be the same* as that for the final substantive offense. But the law does not treat conspiracies, which are continuing offenses, the same way as substantive violations of the law.

1.    *Principles of conspiracy law*

"[A] conspiracy to commit a crime is a different offense from the crime that is the object of the conspiracy." *United States v. Rabinowich*, 238 U.S. 78, 85 (1915). In many ways, conspiracies are worse. When there is formation of a "partnership in crime," there is "a greater potential threat to the public than individual delicts." *Iannelli v. United States*, 420 U.S. 770, 778 (1975). "Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality." *Id.* In addition, "[g]roup association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish." *Id.* Conspiracies also operate under the cover of darkness, in order to facilitate "deliberate plotting to subvert the laws[.]" *Rabinowich*, at 88. Thus "[t]he basic rationale of the law of conspiracy is that a conspiracy may be an evil in

7

itself, independently of any other evil it seeks to accomplish." *Dennis v. United States*, 341 U.S. 494, 573 (1951) (Jackson, J., concurring).

Because a conspiracy is "characterized by secrecy," the law recognizes that it is "difficult of detection, requiring more time for its discovery, and adding to the importance of punishing it when discovered." *Rabinowich*, 238 U.S. at 88. Therefore, a conspiracy is deemed under the law to "continue[] up to the time of abandonment or success." *United States v. Kissel*, 218 U.S. 601, 608 (1910).

Until the conspirators succeed or abandon their illicit plan, the continuity of a conspiracy is marked by "the continuous co-operation of the conspirators to keep it up[.]" *Kissel*, 218 U.S. at 607. It is not necessary that these "overt acts" be "the substantive crime charged in the indictment as the object of the conspiracy," nor must they "even be criminal in character." *Yates v. United States*, 354 U.S. 298, 334 (1957). All that is required of these acts is that they simply "manifest that the conspiracy is at work." *Id.* (internal quotations omitted).

Based on these principles, the Supreme Court in *Grunewald* held in no uncertain terms that a conspiracy is timely and within the period of the statute of limitations when "at least one overt act in furtherance of the conspiratorial agreement was performed within that period." 353 U.S. at 397. And to determine whether an overt act was in furtherance of the conspiracy, courts must, in turn, examine "the precise nature and extent of the conspiracy," which can only be *determined by*

reference to the agreement which embraces and defines its objects." *Braverman v. United States*, 317 U.S. 49, 53 (1942) (emphasis added).

The scope of the agreement alleged by the United States is clear. Simply put, it was the purchase of a criminal prosecution with bribes. FSI ¶ 21(3).

### 2. *Conspiracies embrace the effort to collect the "spoils"*

The Ninth Circuit recognizes that a conspiracy endures well beyond the commission of the substantive offense, and reaches all the way up to the conspirators' effort to collect the "spoils" for which the partnership was formed.

That is why in *United States v. Walker*, a conspiracy to defraud the United States by rigging the disbursement of timber contracts did not simply end when the contracts were fraudulently procured. 653 F.2d 1343, 1344 (9th Cir. 1981). Instead, the conspiracy continued on, after the timber had been cut and sold to third parties, and "lasted through the division of the excess profits Walker made on the sale among the co-conspirators." *Id.* at 1346. This was so, because "*the agreement itself* aimed beyond merely defeating the government process of competitive bidding and encompassed the ultimate objective of making excess profits to be shared among the co-conspirators." *Id.* at 1346–47 (emphasis added).

The concept that conspiracies contemplate "dividing the spoils" of the enterprise, *Walker*, 653 F.2d at 1348, is a principle that has been applied in many other circuits across a variety of contexts. For example, a conspiracy to commit espionage did not conclude with the transmission of national secrets to a foreign

adversary. *United States v. Helmich*, 704 F.2d 547, 548 (11th Cir. 1983). Rather, it persisted for another 16 years to account for the defendant's attempt to collect the "payoff." "If steps are taken to collect the money owed after the secrets have already been transmitted, then the limitations period on the conspiracy does not commence upon transmittal *because the payoff is an overt act*." *Id.* at 549 (emphasis added).

Similarly, a conspiracy to kidnap a person and transport him across state lines for ransom did not suddenly terminate once the ransom was paid and the victim was released. *McDonald v. United States*, 89 F.2d 128, 131 (8th Cir. 1937). To the contrary, the conspiracy survived for many more months, as one of the conspirators traveled to a foreign country to exchange the ransom money for unmarked bills. *Id.* In so holding, the Eighth Circuit rejected the argument that, since the underlying kidnaping statute did not proscribe the exchange of ransom money, the conspiracy must have ended when the victim was transported interstate and held for ransom. *Id.* at 132. "What was the object to be attained by the capture," the court reasoned, except "for the purpose, therefore with the object, of illicit gain"? *Id.* at 133.

Tanaka makes precisely the same flawed argument rejected by the Eighth Circuit in *McDonald*. She contends that because § 666 prohibits only "the action of either corruptly *giving or accepting* 'anything of value' with the intent to influence," then under the terms of the statute a "conspiracy to commit federal program bribery in violation of § 666 concludes when the last corrupt payment . . . is given, accepted or solicited." MTD at 8 (emphasis in original). Tanaka's logic flies in the face of

*McDonald*, *Helmich*, and *Walker*, as well as many other circuit authorities. See, e.g., *United States v. Girard*, 744 F.2d 1170, 1172 (5th Cir. 1984) ("conspiracy continued until Girard had realized fully his anticipated economic benefits"); *United States v. Mennuti*, 679 F.2d 1032, 1032 and 1035 (2d Cir. 1982) ("a conspiracy can continue even after the commission of the substantive underlying offense" and "continues until the conspirators receive their payoffs"); *United States v. Hickey*, 360 F.2d 127, 141 (7th Cir. 1966) ("that the 'central objective' of the conspiracy has been nominally attained does not preclude the continuance of the conspiracy. Where there is evidence that the conspirators originally agreed to take certain steps after the principal objective of the conspiracy was reached, or evidence from which such an agreement may reasonably be inferred, the conspiracy may be found to continue"); *Koury v. United States*, 217 F.2d 387, 388 (6th Cir. 1954) ("A conspiracy is not ended by the illegal transportation of a stolen car when the fruits of the transportation are yet to be obtained and divided by the conspirators").

The "payoff" or "spoils" allegedly desired by the MAI defendants may not have been monetary, but it was just as tangible: they wanted to bury L.J.M. under the weight of a criminal prosecution. The United States intends to call witnesses who are expected to testify that on the day L.J.M. was arraigned, Tanaka and other MAI defendants showed up to court with a camera to capture the moment. Because the entire objective of the conspiracy was to have L.J.M. prosecuted, and because the bribes were but a means to facilitate that prosecution, the conspiracies to commit

violations under § 666 endured for as long as the criminal case against L.J.M. was in play. Cf. *Myles v. United States*, No. 20-55910, 2022 WL 4011172 at *1 (9ᵗʰ Cir. September 2, 2022) ("A claim closely associated with a claim for malicious prosecution does not accrue until criminal proceedings are terminated") (citing *Heck v. Humphrey*, 512 U.S. 477, 489 (1994)).

This is black letter conspiracy law. For the entire period when L.J.M. was under felony charges, "each day's acts [brought] a renewed threat of the substantive evil Congress sought to prevent." *Toussie v. United States*, 397 U.S. 112, 122 (1970).

### 3.    *Borman is distinguishable*

None of the cases cited by Tanaka suggests a contrary result. This includes *United States v. Borman*, 559 F.3d 150 (3d Cir. 2009), the case she leans on most.

*Borman* does not help Tanaka. True, the Third Circuit in that case found that a conspiracy to violate § 666(a)(1)(B) was complete when the defendant, an administrator of a federal aid program, received the bribe. 559 F.3d at 1173. But the outcome of *Borman* turned on the very narrow scope of the conspiracy as it was defined in that indictment. *Id.* at 154. Because "the government chose to frame the scheme as one to corruptly solicit and accept payments," the court held that the conspiracy "was accomplished in full when the payments were received." *Id.*

This holding was simply an extension of the principle that "the precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects." *Braverman*, 317 U.S. at 53; see *Girard*, 744 F.2d

at 1172 ("Given the narrow scope of the particular indictment, we could not say that the obtaining of the contract was an objective of the conspiracy as charged"). In other words, the scope of the conspiracy in *Borman* was articulated in such a limited way that the government could not explain how the overt acts in question "could have been in furtherance of an agreement to solicit and to accept payments for contractors."[3] 559 F.3d at 153. That is not the case here. The United States has alleged a *quid pro quo* bribery scheme to prosecute L.J.M., and has identified specific prosecutorial acts that occurred within the statute of limitations.[4]

For instance, on June 13, 2017, a deputy prosecutor acting for Kaneshiro filed a pleading opposing the dismissal of the prosecution against L.J.M. FSI ¶ 22(48). Later, acting on Kaneshiro's behalf, the same prosecutor appeared in court and made arguments in support of that pleading. FSI ¶ 22(49). Even "an innocent act by a third

---

[3] When the prosecutors in *Borman* tried to shoehorn the overt acts into a different theory of the conspiracy, the Third Court forbade it, reasoning that the government could not "retroactively amend the indictment to allege" a new type of scheme. 559 F.3d at 153. This is just additional evidence that *Borman*'s holding was specifically tethered to the particular way the conspiracy was defined in that case.

[4] To be clear, the United States does not believe specific overt acts are necessary to support the conspiracy when the prosecution of L.J.M. was open and pending. This is consistent with the Supreme Court's understanding that a legal action based on "malicious prosecution does not accrue until the criminal proceedings have terminated[.]" *Heck v. Humphrey*, 512 U.S. 477, 489 (1994). So long as the machinery of the criminal process ground inexorably forward—with no effort by the conspirators to shut it down after they had activated the process—there is no need to prove affirmative acts to demonstrate the conspiracy continued. See *United States v. Ben Zvi*, 242 F.3d 89, 97 (2d Cir. 2001) (overt act may be shown by both "affirmative conduct" *and* "deliberate omission"). Ultimately, the issue is an academic one, because in this case there were affirmative acts within the limitations period.

party, if caused by previous act or contact on the part of one of the conspirators, would be enough" to constitute "an overt act in furtherance of the conspiracy." *United States v. Johnson*, 165 F.2d 42, 45 (3d Cir. 1947); see *Winebrenner v. United States*, 147 F.2d 322, 326 (8th Cir. 1945) ("innocent" person induced by conspirator may commit acts "in furtherance of the conspiracy"); Wayne R. LaFave et al., Criminal Procedure § 16.2(g) (5th ed. 1992) ("The act can be that of a single conspirator or even an innocent agent who is acting at his direction").

Then in July 2017, Kaneshiro advised the deputy prosecutor that he wanted to appeal the order dismissing L.J.M.'s case. FSI ¶ 22(50). The deputy then prepared an interoffice memorandum recommending an appeal. FSI ¶ 22(51). Kaneshiro's stated desire to take an appeal was unequivocally an overt act by a member of the conspiracy in furtherance of the plan's objective. "[T]he overt act of one conspirator is imputed to the other coconspirators because each conspirator is in essence the agent of the other." *United States v. Lawson*, 872 F.2d 179, 182 (6th Cir. 1989).

Therefore in this case, unlike in *Borman*, the overt acts fit the criminal objective, hand in glove.

4.      *The remaining arguments fail*

The other cases cited by Tanaka fare no better. The indictments there also defined the conspiracies in ways that were not compatible with the overt acts necessary to support the timeliness of the prosecutions. See *United States v. Roshko*, 969 F.2d 1, 7 (2d Cir. 1992) ("This broad view of the scheme, however, is simply

14

not supported by the indictment"); *United States v. Davis*, 533 F.2d 921, 927 (5th Cir. 1976) ("The sole object of the conspiracy as charged was to make false statements"). These cases are distinguishable and unavailing in the same way.

Finally, it is worth noting that Tanaka appears to concede the conspiracy to commit honest services wire fraud is timely. See MTD at 15 ("Ms. Tanaka does not seek to challenge on limitations grounds this aspect of the charged honest services fraud conspiracy"). There is no reason why the conspiracy to commit federal program bribery should be any different. Tanaka points to a distinction between the two: a substantive honest services offense requires *quid pro quo* intent whereas a substantive federal bribery offense does not. MTD at 9. While there is truth to this statement, compare *United States v. Garrido*, 713 F.3d 985, 1001 (9th Cir. 2013), with *United States v. Kincaid-Chauncey*, 556 F.3d 923, 943 (9th Cir. 2009), abrogated on other grounds by *Skilling v. United States*, 561 U.S. 358 (2010), there is no reason why this difference matters. Federal program bribery under § 666 embraces *quid pro quo* schemes even though they are not required under the statute. See *United States v. McNair*, 605 F.3d 1152, 1188 (4th Cir. 2010) ("many § 666 bribery cases will involve [a *quid pro quo*] but that is not required to convict"); *United States v. Abbey*, 560 F.3d 513, 520 (6th Cir. 2009) (*quid pro quo* is sufficient but not necessary in § 666 prosecution); *United States v. Gee*, 432 F.3d 713, 714 (7th Cir. 2005) (same). More importantly, this distinction does not bear on the scope of the conspiracy alleged, which is what controls the timeliness question here.

For all of these reasons, the conspiracies to commit federal program bribery set forth in Count One are timely.

C.   THE CONSPIRACY TO INJURE L.J.M.'S FREE EXERCISE OF THE FOURTH AMENDMENT IS NOT OUTSIDE THE STATUTE OF LIMITATIONS

Tanaka next contends that "to the extent that the alleged conspirators agreed to seek L.J.M.'s arrest as an object of their conspiracy," that conspiracy is untimely because the arrest occurred outside of the statute of limitations in December 2014. MTD at 18. Even viewing the conspiracy in this light, Tanaka overlooks that the arrest was merely the initial step of a continuing series of unlawful seizures that flowed automatically from the arrest into the limitations period of this case.

It may be helpful to first identify what Tanaka *does not* try to dismiss. She does not challenge the timeliness of the conspiracy to violate the Fourth Amendment by instituting malicious legal process. "[T]he gravamen of the Fourth Amendment claim for malicious prosecution, as this Court has recognized it, is the wrongful initiation of charges without probable cause." *Thompson v. Clark*, 142 S.Ct. 1332, 1337–38 (2022) (observing that Supreme Court precedents "recognize such a claim" for "unreasonable seizure pursuant to legal process"). The "seizure" is predicated on the understanding that "[s]uch a defendant is scarcely at liberty; he remains apprehended, arrested in his movements, indeed 'seized' for trial, so long as he is bound to appear in court and answer the state's charges." *Albright v. Oliver*, 510 U.S. 266, 279 (1994) (Ginsburg, J., concurring) (joined by Justice Souter in

concurrence and Justices Stevens and Blackmun in dissent); see *Gallo v. Philadelphia*, 161 F.3d 217, 222 (3d Cir. 1998) (bail, required attendance at court, and travel restrictions, were restrictions of post-indictment liberty that "amounted to a seizure"); *Murphy v. Lynn*, 118 F.3d 938, 946 (2d Cir. 1997) (post-arraignment conditions such as travel restrictions and periodic court appearances "are appropriately viewed as seizures within the meaning of the Fourth Amendment"). The United States intends to pursue this theory of the conspiracy at trial—and Tanaka appears to concede it is within the statute of limitations.

In her motion, Tanaka instead urges the Court to set aside the conspiracy to the extent its object was limited to effectuating an arrest. MTD at 18. The United States intends to pursue this theory, as well. But the conspiracy to arrest L.J.M. did not consummate simply because the arrest happened. The threat of an unlawful arrest continued to loom over L.J.M. throughout the entirety of her wrongful prosecution.

Furthermore, as Justice Souter observed in *Albright*, a host of "injuries usually occur only after an arrest or other Fourth Amendment seizure[.]" 510 U.S. at 290 (concurring opinion). These include additional Fourth Amendment injuries, such as "restraint on movement" and "bond terms," as well as personal injuries, such as "[d]amage to reputation" and "mental anguish." *Id.* In other words, by conspiring to have L.J.M. arrested, the defendants were able to inflict additional and continuing seizures and injuries upon their target. This was unquestionably part of the plan, because under Hawaii Revised Statutes § 804-7.4, any person arrested and released

on bail or recognizance is, by force of law, "subject to" pretrial conditions that include travel restrictions and the requirement to appear for court.

Accordingly, the defendants' success in arresting L.J.M. allowed them to put into motion additional violations of the Fourth Amendment. Under *Walker, Helmich*, and *McDonald*, as analyzed in the preceding section, these additional seizures permitted the defendants to realize the "spoils" of their plot, which was the infliction of continuing pain upon L.J.M., by wielding the criminal justice system as their cudgel, for as long as they were able to keep the prosecution going. And so they did—for nearly three years—well into the limitations period of this case.

Moreover, the Ninth Circuit has recognized that "conspiracies can last beyond the attaining of their major objective to the achievement of other subsidiary objectives afterward." *Walker*, 653 F.2d at 1349–50. Assuming the premise of Tanaka's argument that arresting L.J.M. was a "major objective" of the conspiracy, there plainly were "other subsidiary objectives afterward." *Id.* As the United States has sought to make clear in this brief, those objectives were the prosecution of L.J.M., and the constitutional deprivations of liberty that would organically follow.

D.   THE CONSPIRACY TO SEIZE L.J.M. VIA THE IMPOSITION OF CASH BAIL DID NOT TERMINATE ONCE BAIL WAS SET ASIDE

Tanaka also urges the Court to dismiss the conspiracy "to the extent" the defendants "conspired against L.J.M.'s Fourth Amendment rights by seeking to impose on her a 'cash bond[.]'" MTD at 19. Here the motion erroneously seeks to

silo off one aspect of a fluid criminal conspiracy while ignoring the broader theory of the indictment—namely, that the defendants aimed to foist on their victim a continuing series of interrelated seizures in which cash bail was only a part. Yet even on its own myopic terms, the argument fails.

As the evidence at trial will show, L.J.M. posted $20,000 cash bail in order to secure her release from custody. Later, through retained counsel, L.J.M. moved to set aside the bail so she could be released on her own recognizance. The state court judge granted the motion—over the objection of Kaneshiro's office.

Tanaka argues that after the bail was set aside in February 2015, beyond the statute of limitations, any agreement among the conspirators to place L.J.M. under bail restrictions "necessarily ended." MTD 19. Yet Tanaka provides no support for this unfounded assertion. The "defeat of the conspiracy's objective will not necessarily and automatically terminate the conspiracy." *United States v. Jimenez Recio*, 537 U.S. 270, 275 (2003). On the contrary, a conspiracy ends when one of two things happen: "abandonment or success." *Kissell*, 218 U.S. at 608.

Nothing shows the defendants abandoned their plot to subject L.J.M. to bail after the judge set it aside, even if that were the sole aim of the conspiracy. Quite the opposite appears true. Kaneshiro *opposed* L.J.M.'s request to be released on her own recognizance even though she had no criminal record, had strong ties to the Island, had robust employment history, and exhibited no risk of fleeing prosecution or committing future crimes. More importantly, Kaneshiro maintained a felony

prosecution over L.J.M.'s head for nearly three years without probable cause, as the state court judge determined. On these facts, a jury could find that the defendants continued to look for ways to levy bond restrictions upon L.J.M., and would have done so had any of the pretrial bond factors shifted in their favor. That L.J.M. continued to be baselessly prosecuted into the limitations period supports this view of the evidence. In other words, the threat of further monetary seizures hung over L.J.M.'s head as long as the defendants pressed forward the unlawful prosecution.

The analysis only confirms, however, that this is a question for the jury to decide at trial. As previously outlined, "a Rule 12(b) motion to dismiss is not the proper way to raise a factual defense." *Nukida*, 8 F.3d at 669.

### E.   THE CONSPIRACY TO COMMIT HONEST SERVICES WIRE FRAUD IS TIMELY

Finally, Tanaka reads the *quid pro quo* agreement in the FSI to mean that bribes were promised in exchange for two things: "to open an investigation into and prosecute former MAI employee L.J.M." FSI ¶ 21(3). Tanaka "does not seek to challenge on limitations grounds" the part of the honest services fraud conspiracy that focuses on prosecuting L.J.M. MTD at 15. But she requests dismissal of the conspiracy "to the extent" its object was to "open an investigation" into L.J.M., because that must have been accomplished "well before" the prosecution was initiated in December 2014. MTD at 16.

The Court should reject this argument, which parses the FSI too finely. The bribery conspiracy encompasses the totality of the mistreatment L.J.M. suffered at

the hands of Kaneshiro's office—beginning with an unfounded investigation and blossoming into a malicious prosecution. Moreover, an investigation does not simply end once a prosecution begins. It continues. That is why prosecuting offices have a continuing duty to provide discovery to the defense. There may be additional evidence that is uncovered during an "investigation" *after* the filing of criminal charges as the case progresses towards trial. And in any event, to the extent these phases of a case could be siloed for statute of limitations purposes, as Tanaka erroneously suggests, the latter phase would constitute acts in furtherance of the former. Either way, there is no statute of limitations problem.

To the extent Tanaka disputes any investigative work occurred during the limitations period, or any overt acts support such an objective, that is for the jury to resolve at trial. When that day arrives, the United States "may submit proof on the full scope of the conspiracy; it is not limited in its proof to the overt acts alleged in the indictment." *United States v. Rizk*, 660 F.3d 1125, 1131 (9th Cir. 2011).

IV

<u>CONCLUSION</u>

The Court should deny Tanaka's motion.

Dated: February 2, 2023                Respectfully submitted,

                                       MERRICK B. GARLAND
                                       Attorney General
                                       RANDY S. GROSSMAN
                                       United States Attorney

                                       */s/ Andrew Y. Chiang*
                                       MICHAEL G. WHEAT
                                       JOSEPH J.M. ORABONA
                                       JANAKI G. CHOPRA
                                       COLIN M. MCDONALD
                                       ANDREW Y. CHIANG
                                       Special Attorneys

UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KEITH MITSUYOSHI KANESHIRO (1),<br>DENNIS KUNIYUKI MITSUNAGA (2),<br>TERRI ANN OTANI (3),<br>AARON SHUNICHI FUJII (4),<br>CHAD MICHAEL MCDONALD (5),<br>SHERI JEAN TANAKA (6),<br><br>Defendants. | CR No. 22-00048-JMS-WRP<br><br>CERTIFICATE OF SERVICE |

IT IS HEREBY CERTIFIED that:

I, Andrew Y. Chiang, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, CA 92101-8893. I am not a party to the above-entitled action. I have caused service of the foregoing on all parties in this case by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 2, 2023.        */s/ Andrew Y. Chiang*
                                                      ANDREW Y. CHIANG

23