IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KEITH MITSUYOSHI KANESHIRO (1),<br>DENNIS KUNIYUKI MITSUNAGA (2),<br>TERRI ANN OTANI (3),<br>AARON SHUNICHI FUJII (4),<br>CHAD MICHAEL MCDONALD (5),<br>SHERI JEAN TANAKA (6),<br><br>Defendants. | CR. NO. 22-00048 JMS-WRP<br><br>ORDER (1) DENYING DEFENDANT DENNIS MITSUNAGA'S AMENDED MOTION TO DISMISS, ECF NO. 273, AND RELATED JOINDERS, ECF NOS. 228, 276, 279, 282, 309; (2) GRANTING IN PART AND DENYING IN PART DEFENDANT TERRI OTANI'S MOTION TO DISMISS, ECF NO. 247; (3) DENYING DEFENDANT MITSUNAGA'S MOTION TO COMPEL DISCOVERY, ECF NO. 299; AND (4) DENYING DEFENDANT MITSUNAGA'S MOTION FOR RULE 17(C) SUBPOENA, ECF NO. 300 |

**ORDER (1) DENYING DEFENDANT DENNIS MITSUNAGA'S AMENDED MOTION TO DISMISS, ECF NO. 273, AND RELATED JOINDERS, ECF NOS. 228, 276, 279, 282, 309; (2) GRANTING IN PART AND DENYING IN PART DEFENDANT TERRI OTANI'S MOTION TO DISMISS, ECF NO. 247; (3) DENYING DEFENDANT MITSUNAGA'S MOTION TO COMPEL DISCOVERY, ECF NO. 299; AND (4) DENYING DEFENDANT MITSUNAGA'S MOTION FOR RULE 17(C) SUBPOENA, ECF NO. 300**

## I. INTRODUCTION

In this public corruption criminal case, the First Superseding

Indictment ("FSI") alleges two counts against Defendants Keith Mitsuyoshi

Kaneshiro ("Kaneshiro"), Dennis Kuniyuki Mitsunaga ("Mitsunaga"), Terri Ann Otani ("Otani"), Aaron Shunichi Fujii ("Fujii"), Chad Michael McDonald ("McDonald"), and Sheri Jean Tanaka ("Tanaka") (collectively, "Defendants"). First, the FSI alleges that Defendants conspired to commit honest services fraud and federal program bribery under 18 U.S.C. § 371.  Second, the FSI alleges that Defendants conspired against civil rights in violation of 18 U.S.C. § 241.  *See* ECF No. 70.

In short, the FSI alleges that Mitsunaga, Otani, Fujii, McDonald, and Tanaka were agents of the engineering and architectural firm of Mitsunaga and Associates, Inc. ("MAI") (collectively, the "MAI Defendants"), and Kaneshiro was the elected Prosecuting Attorney for the City and County of Honolulu.  *Id.* at PageID.168–169.  The FSI alleges in part that the MAI Defendants engaged in acts of bribery, in the form of campaign contributions, so that Kaneshiro would investigate and prosecute former MAI employee "L.J.M." as a form of retaliation against her for suing MAI in federal court, and as an effort to interfere with her rights to litigate those claims.  *Id.*; *see generally United States v. Kaneshiro*, 2023 WL 4236175 (D. Haw. June 28, 2023).

This Order rules on several related motions and joinders that were argued on November 7, 2023.  Defendants accuse the United States (the "government" or "prosecution") of outrageous government conduct—more

2

specifically, prosecutorial misconduct—in procurement of the FSI before the grand jury.  And Otani seeks to dismiss the FSI or to suppress evidence based on alleged violations of her Fifth Amendment right against self-incrimination during her grand jury testimony.

Specifically, Mitsunaga has filed an "Amended Motion to Dismiss the FSI due to Prosecutorial Misconduct," ECF No. 273, which is joined by Kaneshiro, Otani, Fujii, McDonald, and Tanaka.  *See* ECF Nos. 282, 309, 275, 276, 279, 228.[1] Second, Otani has filed a "Motion to Dismiss the FSI for Prosecutorial Misconduct or, in the Alternative, to Suppress Statements and Convene a *Kastigar* Hearing," ECF No. 247.  And third, Mitsunaga has filed two related discovery-type Motions related to his Motion to Dismiss: a "Renewed Motion to Compel Discovery," ECF No. 299, and a "Motion for Rule 17(c) Subpoena to United States Attorney's Office," ECF No. 300.

Based on the following, the court (1) DENIES Mitsunaga's Amended Motion to Dismiss; (2) GRANTS Otani's Motion to Dismiss in PART and DENIES it in PART, requiring the government and Otani to meet and confer

---

[1]  Tanaka filed a Substantive Joinder, ECF No. 228, to Mitsunaga's original Motion to Dismiss, ECF No. 222, which was superseded by Mitsunaga's Amended Motion to Dismiss. Although the Substantive Joinder was not re-filed, the court construes it as pertaining to the Amended Motion to Dismiss.

regarding suppression of certain testimony of Otani made during grand jury proceedings; and (3) DENIES Mitsunaga's two discovery-related Motions.

## II. <u>LEGAL STANDARDS</u>

The court begins with applicable legal standards for prosecutorial misconduct and related principles.  Then, because much of the actual grand jury testimony and related exhibits remains under seal, *see* ECF No. 287, the court proceeds directly to analyzing Defendants' arguments—including a discussion of enough of the details of the grand jury testimony and evidence at issue as necessary to understand the issues and the court's reasoning.

### A.    **Prosecutorial Misconduct**

"A district court may dismiss an indictment for government misconduct for one of two reasons, each with its own standard: either because it finds a serious due-process violation or because it concludes that dismissal is warranted under its supervisory powers."  *United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir. 2020) (citation omitted).  "A defendant who challenges the indictment on either ground bears a heavy burden to demonstrate that the prosecutor engaged in flagrant misconduct deceiving the grand jury or significantly impairing its exercise of independent, unbiased judgment."  *United States v. Venegas*, 800 F.2d 868, 869–70 (9th Cir. 1986) (citations omitted).  "Moreover, the defendant must show that the prosecutorial misconduct prejudiced him."  *Id.* at

870; *see also Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988) ("We hold that, as a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants.").

"Dismissal for a due-process violation requires the government's conduct to 'be so grossly shocking and outrageous as to violate the universal sense of justice.'" *Bundy*, 968 F.3d at 1030 (quoting *United States v. Kearns*, 5 F.3d 1251, 1253 (9th Cir. 1993)). "The [due process argument] is usually raised in situations where law enforcement conduct involves extreme physical or mental brutality or where the crime is 'manufactured by the government from whole cloth.'" *Id.* (quoting *United States v. Green*, 962 F.2d 938, 942 (9th Cir. 1992)).

"A district court may dismiss an indictment under its inherent supervisory powers '(1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct.'" *Id.* (quoting *United States v. Struckman*, 611 F.3d 560, 574 (9th Cir. 2010)). "When considering an exercise of its supervisory powers, a district court has various options." *Id.* at 1031. It may limit witness testimony, sanction attorneys, or dismiss the case without prejudice. *Id.* But "[u]nder its supervisory powers, a district court may dismiss an indictment *with* prejudice for prosecutorial misconduct only if there is '(1) flagrant misbehavior

and (2) substantial prejudice.'" *Id.* at 1031 (quoting *Kearns*, 5 F.3d at 1253) (emphasis added).

"[D]ismissal of the indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia*, 487 U.S. at 256 (quoting *United States v. Machanik*, 475 U.S. 66, 78 (1986)).

"[T]he Government has no obligation to present evidence to the grand jury that is favorable to the accused." *United States v. Fuchs*, 218 F.3d 957, 964 (9th Cir. 2000) (citing *United States v. Williams*, 504 U.S. 36, 50–56 (1992)). "[R]equiring the prosecutor to present exculpatory as well as inculpatory evidence would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body." *Williams*, 504 U.S. at 51. Similarly, "[a] prosecutor has no duty to present evidence bearing on witness credibility to the grand jury." *United States v. Spillone*, 879 F.2d 514, 523 (9th Cir. 1989). And "[n]ot all erroneous statements of government agents warrant dismissal of the indictment." *Id.* at 524 (citations omitted). Such evidence must be "sufficiently material to [have] . . . substantially influenced the grand jury's decision to indict." *Id.* "It is axiomatic that the grand jury sits not to determine guilt or innocence, but to assess whether

6

there is adequate basis for bringing a criminal charge." *Williams*, 504 U.S. at 51

(citing *United States v. Calandra*, 414 U.S. 338, 343 (1974)).

## B.    Intrusion Into Attorney-Client Relationship

"[A] claim of outrageous government conduct premised upon

deliberate intrusion into the attorney-client relationship will be cognizable where

the defendant can point to actual and substantial prejudice." *United States v.*

*Stringer*, 535 F.3d 929, 941 (9th Cir. 2008) (quoting *United States v. Haynes*, 216

F.3d 789, 796 (9th Cir. 2000)).  More precisely, "[a] claim of government

interference with the attorney-client relationship has three elements: (1) the

government was objectively aware of an ongoing, personal attorney-client

relationship; (2) the government deliberately intruded into that relationship; and

(3) as a result, the defendant suffered actual and substantial prejudice." *Id.*

(citation omitted).  "Most cases finding deliberate intrusion into the attorney-client

relationship involve government informants who somehow penetrate the attorney-

client relationship to obtain confidential or privileged information, and then feed

that information to the government." *Id*.

"The Ninth Circuit traditionally has identified two remedies [for such

an intrusion into the attorney client relationship]: 1) dismissal of the indictment,

which is drastic, disfavored, and thus used only in the most egregious cases; or

2) suppression at trial of evidence improperly obtained." *Haynes*, 216 F.3d at 796 (citing *United States v. Rogers*, 751 F.2d 1074, 1076, 1078–79 (9th Cir. 1985)).

## C.   Fifth Amendment Warnings

"[T]he Fifth Amendment does not require that a grand jury witness be warned he [or she] is a potential target of the grand jury investigation." *United States v. Goodwin*, 57 F.3d 815, 818 (9th Cir. 1995) (citing *United States v. Washington*, 431 US. 181, 189 (1977)).  "[T]he failure of the [Assistant United States Attorney ("AUSA")] to comply with internal department policy does not, without more, establish a deprivation of [defendant's] constitutional rights." *Id.* "The U.S. Attorney's Manual is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal." *Id.* (citation and quotation marks omitted). If a defendant "was adequately informed of his rights prior to testifying before the grand jury . . . [an] AUSA's failure to warn [the defendant] that he was a potential target of the grand jury investigation [does] not deprive him of due process." *Id.* at 819.

The Fifth Amendment privilege "not only extends to answers that would in themselves support a conviction . . . but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant." *Ohio v. Reiner*, 532 U.S. 17, 20 (2001) (citing *Hoffman v. United States*, 341 U.S.

479, 486 (1951) (internal quotations omitted).  "[I]t need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result."  *Hoffman*, 341 U.S. at 486–87.

"Because the grand jury does not finally adjudicate guilt or innocence, it has traditionally been allowed to pursue its investigative and accusatorial functions unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial."  *Calandra*, 414 U.S. at 349.  Accordingly, dismissal is not an appropriate remedy if illegally seized evidence is presented to the grand jury.  *Id.* at 349–52 (declining to extend the exclusionary rule to grand jury proceedings).  Pursuant to *Calandra* and its progeny, "the regular operation of generally applicable rules of procedure and evidence at trial is the appropriate remedy."  *United States v. Renzi*, 651 F.3d 1012, 1027 (9th Cir. 2011) (emphasis omitted).

There is a fundamental distinction between the use of privileged information at trial, and its use during the investigatory period.  *United States v. Rogers*, 751 F.2d 1074, 1079 (9th Cir. 1985) ("Because the grand jury does not finally adjudicate guilt or innocence, it has traditionally been allowed to pursue its investigative and accusatorial functions unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial.") (quoting *Calandra*, 414 U.S.

9

at 349)).  "Thus, an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence . . . or even on the basis of information obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination." *Calandra*, 414 U.S. at 345 (internal citations omitted) (citing *Lawn v. United States*, 355 U.S. 339 (1958)).

## III.  <u>DISCUSSION</u>

### A.    **Mitsunaga's Motion to Dismiss**

Mitsunaga seeks to dismiss the FSI, arguing that the FSI was procured by outrageous government conduct in the grand jury process.  He argues that the combination of several instances of alleged prosecutorial misconduct amounts to a due process violation or otherwise requires dismissal under an exercise of the court's supervisory powers.  He alleges that the prosecution:

- deliberately interfered with the attorney-client relationship between him and his then-attorney (now co-Defendant) Tanaka, *see, e.g.*, ECF No. 273 at PageID.2598;

- knowingly deceived the grand jury regarding the scope of the Honolulu Police Department's ("HPD") investigation of L.J.M.'s alleged theft, *id.* at PageID.2613–18;

- knowingly deceived the grand jury by asking misleading questions about bundling of MAI-related campaign contributions to Kaneshiro, *id.* at PageID.2619–30;

- repeatedly recalled exculpatory witnesses to the grand jury to impeach their credibility and support the government's theory, *id.* at PageID.2631–34;

- falsely told McDonald and Fujii when they testified at the grand jury that they were witnesses when they were actually targets or subjects "to secure their testimony which was used to support the indictment against Mr. Mitsunaga," *id.* at PageID.2638;

- improperly altered grand jury witness subpoenas, *id.* at PageID.2640; and

- improperly procured Otani's testimony in violation of her Fifth Amendment right against self-incrimination, *id.* at PageID.2635.[2]

Tanaka has filed a Substantive Joinder that, among other matters, adds alleged vindictive prosecution of Tanaka—based on the manner under which she was arrested by the Federal Bureau of Investigation—to the litany of allegations of prosecutorial misconduct. ECF No. 228.

These allegations are—separately and collectively—overblown. The court addresses each allegation in turn.

### 1.    *Intrusion Into the Tanaka-Mitsunaga Attorney-Client Relationship*

At the first step of the analysis (i.e., was the government "objectively aware of an ongoing, personal attorney-client relationship," *Stringer*, 535 F.3d at 941), the record clearly indicates that the government knew, relatively early in the grand jury process in 2021, that various grand jury witnesses affiliated with MAI

---

[2]  As discussed later, Otani raises this ground in a separate Motion to Dismiss the FSI against her.  ECF. No. 247.

were all being represented by Tanaka (whom the government knew was MAI's "in-house" counsel and a lawyer for MAI during the prior civil trial involving L.J.M.).  *See, e.g.*, Mitsunaga Mot., Ex. B, ECF No. 273-2.  The government could have inferred that Tanaka would likely also be representing Mitsunaga himself during this period, although the first time the current record shows that Tanaka told the government that she represented Mitsunaga himself appears to be on June 15, 2021, *see* Mitsunaga Mot. Ex. A, ECF No. 273-1 at PageID.2654.  The first step is satisfied, at least as of June 15, 2021.

At the next step of the analysis, however, Mitsunaga has not shown that the government deliberately intruded into such a relationship.  *See Stringer*, 535 F.3d at 941.  Mitsunaga's underlying premise—that Tanaka was in fact a target well before she received a target letter in March 2022—is supported at best by speculation.  Mitsunaga has sought certain information from the government in an attempt to bolster his argument.[3]  But as the government points out, the fact that the grand jury sought certain financial or phone records relating to Tanaka is a far step from her being a target, which requires the grand jury to have "substantial evidence linking [Tanaka] to the commission of a crime, and who, in the judgment of the prosecutor, is a putative defendant."  Dep't of Justice Manual 9-11.151.

---

[3]  The court addressed a prior discovery motion by Mitsunaga in an order of August 29, 2023.  *See* ECF Nos. 261, 301.  And Mitsunaga's two new discovery-related orders—discussed to follow—also are targeted towards this issue.  *See* ECF Nos. 299, 300.

And because the grand jury "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not," *United States v. R. Enters., Inc.*, 498 U.S. 292, 297 (1991) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 642–643 (1950)), the mere fact that Tanaka was being investigated as the grand jury obtained evidence clearly did not necessarily make her a target (particularly early in the grand jury process in 2021).

And equally important, even if the government's actions or inactions were improper in some manner, Mitsunaga has not demonstrated any "actual and substantial prejudice" at the third step, *Stringer*, 535 F.3d at 941, from any possible intrusion into that attorney-client relationship. As prejudice, Mitsunaga points to a July 14, 2021, meeting between Tanaka—as counsel for Mitsunaga—and the government, after Mitsunaga had received a June 2021 target letter. *See* Mitsunaga Mot., Ex. I, ECF No. 273-10 at PageID.3035. Mitsunaga suggests that the government would have acted differently if he was represented by someone else at that time, someone who—unlike Tanaka—was not also being investigated for a role in the same conspiracy. ECF No. 273 at PageID.2607. He argues that the government did not provide meaningful or substantive information at that meeting to Tanaka about the evidence against Mitsunaga because Tanaka was also under investigation, and the prosecution instead "projected suspicion" at Tanaka and the

meeting "turned combative." *Id.* at PageID.2609. This, Mitsunaga argues, rendered Tanaka ineffective, prejudicing him as a result. *Id.*[4]

But the evidence does not indicate that the government *created* the conflict nor took advantage of it. If Tanaka was ineffective, as Mitsunaga's Motion states (*see* ECF No. 273 at PageID.2608–09), it was not the fault of the government. A conflict existed regardless of the government's behavior during that time. And as the government points out, it cannot interfere with someone's choice of attorney by suggesting to them that there is a conflict. *See, e.g.*, *Stringer*, 535 F.3d at 942 ("Indeed, had the government contacted [defendant] directly to warn him about the conflict, bypassing his attorney, the government would have engaged in conduct that itself may have amounted to interference.").

At some point during the grand jury process, the prosecution could have (and perhaps should have) brought to the court's attention Tanaka's potential conflicts of interest in her simultaneously representing all the individual employees of MAI (including Otani, Fujii, McDonald) and some of their family members, as well as Mitsunaga and MAI itself during the grand jury process—each of whom might have had different (and perhaps conflicting) interests and roles (and where

---

[4] At the November 7, 2023 hearing on the motions, counsel for McDonald also joined this argument, suggesting that the government's discussions regarding Mitsunaga might have been different if not for Mitsunaga being represented by an attorney (Tanaka) with a conflict of interest. *See* ECF No. 314 at PageID.5888–93.

14

she was herself involved in some manner in the topics of the investigation).  *See,*

*e.g.,* Mitsunaga Mot., Ex. J, ECF No. 273-11 at PageID.3043.  But Mitsunaga's

argument is largely retrospective.  He suggests that if the prosecution told Tanaka

that she was a target of the investigation before March 2022, when she received a

target letter, then she and others would have known about a conflict.  As for that

potential conflict between Tanaka, who—without valid waivers—could not

ethically represent each of her multiple clients who might also have been potential

defendants at the same time that she was also a potential defendant, there is no

indication that the government knew at the time (throughout 2021) that it would be

targeting her and the other co-defendants for the same conspiracy.  The grand jury

and prosecution were investigating matters and developing evidence in 2021

through early 2022, but they could not have known ahead of time precisely where

the investigation might eventually lead.

In any event, Mitsunaga has failed to demonstrate that the

government's actions or failures were deliberate intrusions into the attorney-client

relationship between Mitsunaga and Tanaka, or that the government took

advantage of knowledge of a conflict.  That is, there is nothing, other than

speculation, suggesting "actual and substantial prejudice."  *Stringer*, 535 F.3d at

941.  There is no evidence, for example, that the government obtained confidential

information about Mitsunaga (or any other Defendant) from Tanaka, or similarly

intruded into the relationship.  *See, e.g.*, *Hayes*, 216 F.3d at 794–96 (finding prejudice where defendant's attorney's investigator served as an informant for the government); *United States v Marshank*, 777 F. Supp. 1507, 1521 (N.D. Cal, 1991) (finding prejudice where an attorney gave the government confidential client information).  Neither Tanaka nor Mitsunaga testified before the grand jury, and the government did not obtain any attorney-client privileged communications from Tanaka during the grand jury process.  Nor has Mitsunaga shown that he or Tanaka would have done anything differently had Tanaka known that the grand jury would eventually have enough evidence to target or indict her later.  Mitsunaga has not shown that "there is 'grave doubt' that the [grand jury's] decision to indict was free from the substantial influence of . . . violations."  *Bank of Nova Scotia*, 487 U.S. at 256.[5]

### 2.     *The Discovery-Related Motions*

Primarily for the reasons just analyzed—no deliberate intrusion and a lack of prejudice—the court DENIES Mitsunaga's two discovery-related motions, ECF Nos. 299, 300.  Specifically, Mitsunaga has filed a renewed motion to compel discovery to obtain subpoenas issued to Experian and Verizon, ECF No. 299,

---

[5] The same reasoning applies to Defendants Fujii, Otani, and McDonald.  That is, they have not shown the prejudice that is necessary to dismiss the FSI based on alleged interference with their attorney-client relationships with Tanaka.  Their joinders are DENIED.  ECF Nos. 276, 279, 309.

arguing that the date of the subpoenas would shed light on when the government deemed Tanaka to be a target. But the court has already considered this issue, and Mitsunaga already has the dates of the responses to the subpoenas—the actual subpoenas would not matter to the court's ruling today. *See* ECF Nos. 261, 301.

Similarly, Mitsunaga's other motion, ECF No. 300, asks this court under Federal Rule of Criminal Procedure 17(c) to order broad and extraordinary production from the prosecuting U.S. Attorney's Office of "all electronic and written communications and internal memoranda" regarding the investigations of Tanaka, Fujii, and McDonald from the commencement of the investigation into them through March 3, 2022 (for Tanaka) and through March 4, 2021 (for Fujii and McDonald). ECF No. 300 at PageID.5651. But the court agrees with the government that such a broad request for internal prosecution materials would amount to a "fishing expedition" for materials covered by work product, deliberative process, or attorney-client privileges. He has not shown that such broad production complies with Rule 17(c) or *United States v. Nixon*, 418 U.S. 683 (1974). *See, e.g.*, *United States v. Reed*, 726 F.2d 570, 577 (9th Cir. 1984) ("Rule 17(c) was not intended as a discovery device, or to allow a blind fishing expedition seeking unknown evidence."); *United States v. Orena*, 883 F. Supp. 849, 867 (E.D.N.Y. 1995) (reasoning that a defendant "may not obtain through Rule 17(c) documents which are protected from disclosure pursuant to Rule 16(a)(2)."). And

17

he has not demonstrated a need for this court to review in camera all the government's internal communications on the subjects.

### 3.     *The Scope of HPD's Investigation—Testimony of Detective Phillip Snoops*

Mitsunaga next points to grand jury witness HPD detective Phillip Snoops, who testified before the grand jury in April 2021, and whose testimony appears to have been inaccurate in certain details about MAI's complaint to HPD regarding L.J.M.'s alleged theft.  Snoops was an HPD officer who had initial responsibility to investigate MAI's allegations in 2012 that L.J.M. had committed theft of services from MAI (by working side jobs on MAI time).  In particular, Snoops testified before the grand jury that he had difficulty following up with anyone at MAI in 2012, after Aaron Fujii reported L.J.M.'s alleged theft to HPD with a 19-page document given to HPD in July 2012.  Snoops testified that he made multiple attempts to contact MAI, with limited success (testifying that "I never got any piece of evidence from them at all," Gov't Ex. 29 at 8, ECF No. 288-27 at PageID.5275).  Under part of the government's theory of the case, this testimony implied that MAI employees were no longer interested in assisting HPD, supposedly because certain Defendants from MAI had gone directly to Honolulu

prosecutor Kaneshiro in the meantime and were providing information to him or his assigned prosecutors directly.[6]

This aspect of Snoops' testimony, however, was inconsistent with some parts of his written reports.  The reports (both a September 14, 2012 version and a February 2013 follow-up report), stated that during the course of his investigation Snoops had "made multiple attempts to contact and speak with Mr. FUJII, [he] was only successful one time. . . . No one has called me to set up an appointment or to provide any information concerning this case."  Mitsunaga Mot., Ex. N, ECF No. 273-15 at PageID.3097, 3101.  But the reports also stated that MAI lawyer *Tanaka*—rather than Fujii—had contacted Snoops a few times in July 2012 to provide additional information (contrary to a narrative that MAI no longer felt a need to provide information to HPD).  *See id.* at PageID.3096, 3099.

In context, Snoops was only one of over 80 witnesses during a 14-month grand jury, ECF No. 288 at PageID.3514.  His April 2021 testimony—

---

[6] In this regard, the FSI alleges:

> 9.  On or about July 17, 2012, FUJII filed a report with [HPD] alleging that L.J.M. and a local Honolulu attorney, S.M—who had filed a lawsuit against MAI earlier in 2012—had committed theft against MAI.  Despite multiple attempts, the assigned HPD Officer was largely unsuccessful in obtaining follow-up information from FUJII and others at MAI about the alleged theft.

ECF No. 70 at PageID.170.  The government argues that this paragraph is true, emphasizing (1) the qualifier "largely" before "unsuccessful," (2) the evidence that Snoops indeed heard little from Fujii after his initial contact, and (3) that much of MAI's contact later was directly with Kaneshiro or his employees, not with Snoops or the HPD.

consisting of only 11 pages, and lasting ten minutes, see Gov't Ex. 29 at 1, 12,

ECF No. 288-27 at PageID.5268, 5279)—does not appear to have been particularly

significant.  Further, as the government argues, his testimony was essentially

consistent with his written reports to the extent the reports stated that it was

difficult to get hold of *Fujii*—he just failed to remember that Tanaka had also

provided information to HPD as well.

 Most importantly, despite the inaccuracy in testimony, Snoops'

reports themselves—which contained all the details of Snoops' contacts with MAI

regarding HPD's investigation into L.J.M.'s alleged theft from MAI—were

themselves admitted into evidence and shown to the grand jury "at least six times

over the course of one year."  ECF No. 288 at PageID.3511–12 (citing instances).

Thus, even assuming that the government did not specifically point out to Snoops

and to the grand jury that Snoops had testified inconsistently with his written

reports, such a failure does not demonstrate prosecutorial misconduct.  *See Fuchs*,

218 F.3d at 964 ("Any inaccuracy that resulted from the investigator's

statement . . . was rendered harmless when the grand jury was presented with the

[reports] themselves.").  The grand jury also had ample other evidence regarding

MAI's contacts, through Tanaka and others, with Kaneshiro and his assigned

prosecutors during the relevant time frame.

20

In short, Mitsunaga has not demonstrated that inaccuracies in Snoops' testimony were "sufficiently material to [have] . . . substantially influenced the grand jury's decision to indict." *Spillone*, 879 F.2d at 524.

### 4.    *Questions Regarding Bundling of Campaign Contributions, and the Date Contributions Were Made*

Mitsunaga also contends that the prosecution deceived the grand jury by repeatedly asking witnesses why, or if they could explain why, the witnesses (who were mostly MAI family members, employees, or friends) contributed to Kaneshiro's campaign for Honolulu prosecutor (or other campaigns) on the same date.  He claims that the grand jury was misled into believing that all MAI-affiliated donors gave to the Kaneshiro re-election campaign on the same date "to support the prosecution's theory of a conspiratorial arrangement."  ECF No. 273 at PageID.2619.  Mitsunaga states that "[p]ublic records of campaign contributions reflect the dates on which the Kaneshiro campaign deposited contributions that it had received and not the date the check was written or the date the donor made the contribution."  *Id.*[7]

---

[7]  The Hawaii Campaign Spending Commission requires a candidate or candidate's committee to report, among other data, the contributions' "date of deposit."  Its guidebook explains that "the date a monetary contribution is deposited is deemed to be the date the contribution is received."  *See* https://ags.hawaii.gov/campaign/files/2020/01/CC-Guidebook.pdf at 11 [https://perma.cc/X88Y-YYM5].  The guidebook also has a section titled "Contributions to be Promptly Deposited," which states:

(continued . . . )

For example, McDonald was asked why he and others "would all contribute to Keith Kaneshiro on October 22nd, 2015."  Mitsunaga Mot., Ex. S, Tr. at 36, ECF No. 273-20 at PageID.3202.  Later, after being asked whether he coordinated his political donations with Mitsunaga, McDonald was asked whether he could "think of any reason why all of your political contributions coincide with the exact same day that Mr. Mitsunaga's contributions are made."  *Id.*, Ex. T, Tr. at 15, ECF No. 273-21 at PageID.3212.  The prosecution asked similar questions of many other witnesses—Mitsunaga claims similar questions were asked of "approximately 25 witnesses," ECF No. 273 at PageID.2619).  *See, e.g.*, Otani Ex. B, Tr. at 29, ECF No. 247-2 at PageID.2304 (asking Otani "why do . . . you contribute on the same time to the same candidate all at the same time"); Mitsunaga Mot., Ex. X, Tr. at 30, ECF No. 273-25 at PageID.3238 (asking Arnold Koya "[d]o you know why you all made the contributions on [April 3, 2013]").

In context, the theme of these questions dealt with whether contributions to the Kaneshiro campaign were coordinated or bundled with other MAI-related contributions (although some questions were asked about

---

> The date a contribution is deposited into the committee's financial institution is the date used for reporting that contribution.  A contribution must be deposited no later than **seven (7) days** after a candidate or any individual authorized to receive contributions on behalf of the candidate has received the contribution.

*Id.* at 13 (bold emphasis in original).

coordination with contributions to several *other* candidates).  *See generally*

Mitsunaga Reply, Ex. H, ECF No. 292-8.  Further, some of these witnesses were

asked about coordination of contributions in slightly different ways.  For example,

Arnold Koya explained to the prosecution and grand jury—consistent with the

Hawaii Campaign Spending Commission's guidebook noted above—that the

Hawaii Campaign Spending Commission reports reflect when a campaign has

deposited checks, not when they were written or dated.  Gov't Ex. 5 at 46, ECF

No. 288-3 at PageID.3694.  The prosecution then asked him several times if he

knew why the contributions were all "deposited" (not made) on the same day.  *See*

*id.* at 49–51, ECF No. 288-3 at PageID.3697–99.  Later, a witness was asked about

why multiple contributions were made "on or near the same day."  Mitsunaga

Reply, Ex. H, ECF No. 292-8 at PageID.5528.  Another witness was asked

questions in term of donations being "reported" and "received," as follows:

> If on October 25th of 2012 a $4,000 donation from
> Dennis Mitsunaga was reported and a $4,000 donation
> from someone named Chan Mitsunaga was reported and
> a $4,000 donation from someone named Glenn Okino
> was reported and a $1,000 donation was received from
> someone named Aaron Fujii and a $250 donation was
> received from Sheri Tanaka, all of these reported on
> October 25th of 2012, do you think that'd be something
> that Mr. Kaneshiro would know?

*Id.* at PageID.5564.  The witness was then asked:

> What about a couple months later on January 28th where
> a $4,000 donation was reported from Chan Mitsunaga, a

$4,000 donation was reported from Dennis Mitsunaga, and a $2,000 donation was reported from Terri Ann Otani, all reported on January 28th of 2013, would Mr. Kaneshiro know about that?

*Id.*

The government submitted an exhibit to the grand jury in April 2021 summarizing contributions made by MAI employees or associates to Kaneshiro on October 25, 2012, January 28, 2013, April 3, 2013, November 26, 2013, and October 22, 2015.  *See* Mitsunaga Mot., Ex. V, ECF No. 273-23 at PageID.3224. These dates apparently came directly from Hawaii Campaign Spending Commission reports.  About a year later, the government submitted to the grand jury a similar (or the same) summary chart that set forth contributions by MAI-associated persons "[broken] down by date and by giver[.]"  Mitsunaga Mot., Ex. W, ECF No. 273-24 at PageID.3228.  These charts were incorporated into the FSI, which charges as overt acts, for example, that:

> (5) *On or about* October 25, 2012, MITSUNAGA contributed $4,000 to KANESHIRO's re-election campaign; MITSUNAGA's spouse, C.O.M., contributed $4,000 to KANESHIRO's re-election campaign; a business partner of MITSUNAGA's, G.O., contributed $4,000 to KANESHIRO's reelection campaign; FUJII contributed $1,000 to KANESHIRO's re-election campaign; and TANAKA contributed $250.00 to KANESHIRO's re-election campaign.

ECF No. 70 at PageID.176–77 (emphasis added); that:

> (12) *On or about* January 28, 2013, MITSUNAGA
> contributed $4,000 to KANESHIRO's re-election
> campaign; MITSUNAGA's spouse, C.O.M., contributed
> $4,000 to KANESHIRO's re-election campaign; and
> OTANI contributed $2,000 to KANESHIRO's re-
> election campaign.

*Id.* at PageID.178 (emphasis added); and that:

> (15) *On or about* April 3, 2013, OTANI, FUJII,
> MCDONALD, MAI employee A.K., and
> MITSUNAGA's daughter L.M., each contributed $1,000
> to KANESHIRO's re-election campaign.

*Id.* (emphasis added).

Examining the context of the prosecution's questions regarding whether witnesses knew whether, or why, contributions were made "on the same day" as other contributions, the court finds nothing that constitutes prosecutorial misconduct, nor anything that indicates the grand jury was deceived in returning the FSI.

Nothing indicates that the grand jury was confused about when contributions were "made." The grand jury had been told by at least two witnesses (Koya and Otani) that the date of a "contribution" is deemed to be the date it was deposited by the campaign. The grand jury on some occasions was given copies of the actual donation checks (with dates that differed by a few days from the reported contribution dates). The FSI charges that Defendants and others contributed to Kaneshiro's re-election campaign "on or about" the dates in the

25

Campaign Spending Commission reports.  And the grand jury had heard from a witness explaining in detail how on one occasion, MAI bundled large contributions together and gave them directly to Kaneshiro's assistant.  *See* Gov't Ex. 17 at Tr. 46–50, ECF No. 288-15 at PageID.4378–82 (testimony explaining how Otani personally delivered a batch of MAI checks with some "around a thousand dollars" to Kaneshiro's assistant while having lunch, and how Kaneshiro knew that Mitsunaga was "being generous and . . . donating to him"); *see also* Gov't Ex. 21 at Tr. 19, ECF No. 288-19 at PageID.4694 (testimony of an MAI business associate about delivering several persons' checks directly to Fujii or his secretary at work).

Mitsunaga points to several specific instances where checks were apparently signed on dates that differed from the dates the Kaneshiro campaign deposited them (and thus differed from the date a contribution is "made" for purposes of Campaign Spending Commission reporting).  *See* Mitsunaga Reply, Ex. I, ECF No. 292-9 at PageID.5565 (providing a list of ten checks signed before the reported deposit date).  But almost all those checks were signed within seven days of deposit (with two being signed eight or nine days before deposit)—and there is no indication of when the checks were in fact given to Kaneshiro's campaign prior to deposit.  Kaneshiro's re-election campaign thus appears to have been complying with the Hawaii Campaign Spending Commission's guideline to

26

deposit checks promptly.  *See also* Gov't Ex. 18 at Tr. 32, ECF No. 288-16 at PageID.4563.  And so, those checks must necessarily have been given to Kaneshiro or his re-election campaign within a few days prior to the deposit date—evidence of coordination.[8]

   Moreover, many, if not most, of those checks were given by the donors to an MAI-affiliated person (not to Kaneshiro) for subsequent delivery to Kaneshiro—allegedly at Mitsunaga's request—and those checks must then have been given to Kaneshiro by MAI after the date the checks were signed.  A donor should not be able to claim that the donor "contributed" to Kaneshiro on the date the donor wrote the check or the date the donor gave the check to *Mitsunaga*; it makes sense to deem the date the contribution was "made"—as does the Campaign Spending Commission—to be the date of Kaneshiro's deposit.  In short, it is not an unfair question to ask witnesses (1) if they knew that their donations were being combined with others (e.g., from MAI employees) and given to Kaneshiro in a coordinated fashion "on exactly the same day," and (2) if so, if they know who was responsible for doing it.

---

[8]  Indeed, it would be difficult for a donor to write a check, give it to an MAI employee who then gave it to Kaneshiro's campaign, which then deposited it all in the same day.  The government does, however, point to an instance where a check for $1,000 from a relative of Otani to Kaneshiro's campaign was dated October 21, 2015, and then was deposited by the campaign on October 22, 2015.  *See* Gov't Ex. 14 at 93, 107, ECF No. 188-12 at PageID.4272, 4286.

Although some of the prosecution's questions in the grand jury may have been aggressive or accusatory, the prosecution appears to have been pressing witnesses for information relating to a "quid pro quo" between contributions and Kaneshiro's prosecution of L.J.M.  *See, e.g.*, *Evans v. United States*, 504 U.S. 255 (1992); *United States v. Inzunza*, 638 F.3d 1006 (9th Cir. 2011).  Especially given that legitimate purpose, the court finds no due process violation, no flagrant misconduct, and no indication that the grand jury was deceived into issuing the FSI.  Most importantly, even assuming there was improper conduct, Mitsunaga has not demonstrated substantial prejudice—the critical prong in an analysis of whether improper government conduct can lead to dismissal of an indictment.  *See, e.g.*, *Bank of Nova Scotia*, 487 U.S. at 254.  His challenges, instead, essentially are to the merits of the charges, e.g., that the contributions were not as a factual matter bundled or given in exchange for official action.  And "an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence."  *Calandra*, 414 U.S. at 345.

### 5.    *Other Allegations*

Similarly, the other reasons given by Mitsunaga do not amount to prosecutorial misconduct.  Mitsunaga takes issue with many grand jury witnesses having been re-called and asked or re-asked questions, claiming that this tactic was used to indicate to the grand jury that it should not believe their testimony.

Mitsunaga suggests that the tactic was either to coax a witness into committing perjury or to devalue their testimony (presumably that favorable to the Defendants).  But, as the government argues, the Ninth Circuit has not recognized a "perjury trap" doctrine.  *See United States v. Chen*, 933 F.2d 795, 797 (9th Cir. 1991).  There are many reasons why a witness may be re-called over a long grand jury (especially during COVID-19 protocols).  As more information unfolds, it could be natural for a grand jury or prosecutor to want to hear again from witnesses whose testimony may become more important.  Mitsunaga has not demonstrated any improper questioning that constitutes flagrant misconduct that deceived the grand jury or "significantly impair[ed] its exercise of independent, unbiased judgment."  *Venegas*, 800 F.2d at 870.  Again, the prosecution has no obligation to present evidence favorable to the accused.  *Fuchs*, 218 F.3d at 964 (citing *Williams*, 504 U.S. at 50–56).

Nor has Tanaka presented compelling evidence in the manner of her arrest that could add to any prosecutorial misconduct, as she argues in her substantive joinder.  After reviewing internal emails from the government (which was done on an ex parte basis in open court on November 7, 2023, *see* ECF No. 314 at PageID.5906–07), the court accepts the government's explanation that its office (out of the Southern District of California in San Diego) had no or little involvement in the manner of Tanaka's arrest, which was handled by FBI agents in

the Los Angeles area and by a government attorney from the Central District of California in Los Angeles.  *See* Gov't Ex. 1, ECF No. 285-1.  The court also accepts the government's explanation that FBI protocol where firearms may be involved can justify certain means of arrest.  *See* Gov't Ex. 2, ECF No. 285-2.  In short, Tanaka has not demonstrated that her arrest was the result of vindictive prosecution, and thus the manner of her arrest is not a ground for supporting Mitsunaga's Motion to Dismiss.[9]

The court also finds no prosecutorial misconduct in failing to notify Fujii or McDonald earlier than it did that they were targets of the grand jury investigation.  As the government explains, much evidence was presented in the year between early 2021, when McDonald and Fujii were first called to the grand jury,[10] and March 2022, when they received target letters.  ECF No. 288 at PageID.3521.  Regardless, "the Fifth Amendment does not require that a grand jury witness be warned he is a potential target of the grand jury investigation," *Goodwin*, 57 F.3d at 818, where they were otherwise given adequate Fifth Amendment warnings.

_____

[9]  As stated at the November 7, 2023 hearing on the motions, Tanaka's Substantive Joinder was denied to the extent it was construed, in part, as a stand-alone motion.  *See* ECF No. 310; ECF No. 314 at PageID.5911.

[10]  At the November 7, 2021 hearing, the government pointed out that McDonald and Fujii were the first and second witnesses called to testify before the grand jury, in February 2021, and were re-called again shortly thereafter.  *See* ECF No. 314 at PageID.5903.  They were the first, second, third, and fifth witnesses for the entire grand jury investigation.  *See id.*

Mitsunaga has also not shown that there was anything prejudicial in

the government adding a statement to grand jury subpoenas that read

> ***This is a continuing investigation. You are requested
> not to disclose the existence of this Subpoena for an
> indefinite period of time. Any such disclosure could
> interfere with the investigation being conducted and
> thereby impede the enforcement of the law.

Mitsunaga Mot., Ex. HH, ECF No. 273-35 at PageID.3336. Mitsunaga admits that

the impact of the request "is difficult to ascertain," ECF No. 273 at PageID.2642.

He cannot be suggesting that if a subpoenaed witness had disclosed the existence

of the subpoena to someone—contrary to the request in the statement—then the

FSI would not have been issued, nor does he suggest that his defense was

otherwise prejudiced by a witness failing to contact others. He has not identified

any witnesses who refused to speak to the defense because of the request, much

less argued that the request interfered with access to witnesses. *See United States*

*v. Bryant*, 655 F.3d 232, 239 (3d Cir. 2011).

The court does not condone such requests, but even if including

language requesting nondisclosure is improper as inconsistent with Federal Rule of

Criminal Procedure 6(e)(2)(A),[11] the practice here is not a due process violation

and does not require dismissal of the FSI. *See id.* at 238–39 (upholding denial of

---

[11] Rule 6(e)(2)(A) provides "No obligation of secrecy may be imposed on any person except in accordance with Rule 6(e)(2)(B)."

motion to dismiss where similar language was included in subpoenas, finding no

due process violation). *Bryant* distinguished between a request for nondisclosure

and an imposition of an obligation not to disclose:

> [T]here is an important difference between requesting
> nondisclosure and discretion on the part of witnesses and
> artificially restricting defense counsel's access to
> witnesses by, for example, instructing the latter not to
> communicate with the former. Merely requesting that
> witnesses practice discretion does not violate a
> defendant's due process rights. Here, the record
> demonstrates that the Government requested, but never
> required, witnesses not to disclose the subpoena or the
> grand jury proceedings. Aside from those requests, it
> took no affirmative steps to restrict or stop witnesses
> from conferring with the defense.

*Id.* at 238 (internal citation omitted); *cf. In re Vescovo Special Grand Jury*, 473 F.

Supp. 1335, 1336–37 (C.D. Cal. 1979) (denying motion to quash grand jury

subpoena, reasoning in part that "[t]he government's letter requesting that the

subpoena not be disclosed to the depositor may . . . be interpreted as an informal

request that the bank exercise any discretion it may have not to disclose the

subpoena. As such, the letter does not require the bank to do or not to do anything.

It merely informs the bank that the government believes its investigation would be

hindered by disclosure of the subpoena"); *Contra In re Grand Jury Proceedings*

*(Diamante)*, 814 F.2d 61, 70 (1st Cir. 1987) (finding that a government practice of

sending letters to all subpoenas *directing* nondisclosure to violate Federal Rule of Criminal Procedure 6(e)(2)).[12]

### 6.   *Mitsunaga Has Not Met His Burden to Dismiss the FSI*

Given the court's reasoning as to each of Mitsunaga's alleged instances of misconduct, the court concludes that Mitsunaga has not met his burden to establish that any violations or misconduct—either individually or collectively—"substantially influenced the grand jury's decision to indict." *Bank of Nova Scotia*, 487 U.S. at 256.  He has not shown that "there is 'grave doubt' that the decision to indict was free from the substantial influence," of any violation or violations.  *Id.*

### B.   Otani's Motion to Dismiss Based on Alleged Fifth Amendment Violations

Otani seeks to dismiss the FSI, arguing that her Fifth Amendment right against self-incrimination was violated when, on June 17, 2021, she was ordered to answer "all questions posed to her as reflected in the transcript of [Otani] taken on May 27, 2021 and to which she refused to answer and invoked her Fifth Amendment right."  Otani Mot., Ex. E at 4, ECF No. 247-5 at PageID.2429.  More so, she argues, this was at a time when she contends she was a target of the

---

[12]  If the court had been informed earlier (such as during the grand jury process itself) of the practice of adding such a request to the grand jury subpoenas, it might have taken some action at that time.  Here, however, no prejudice has been demonstrated.

investigation and instead was told she was a witness.  The context for that June 17, 2021 Order is important, as it was one of several orders from three different District Judges from this District ruling on motions to compel grand jury testimony from MAI-related witnesses (all represented by Tanaka at the time).[13]

### 1.    The Context for the June 17, 2021 Order

On June 10, 2021, District Judge Derrick Watson granted a government motion to compel grand jury testimony and ordered grand jury witness Arnold Koya, an MAI executive, to answer questions.  Gov't Ex. 9, ECF No. 288-7.  Koya had appeared (after being ordered to appear by Judge Watson) before the grand jury on May 27, 2021, but Koya began his testimony by reading a prepared statement setting forth aspects of his medical history and his version of the circumstances that had led to his arrest for contempt, and for those reasons he invoked his Fifth Amendment right against self-incrimination and later declined to answer any further questions.  *See* Gov't Ex. 5, ECF No. 288-3.  In response, on June 3, 2021, the government filed a motion to compel Koya to testify that Judge Watson granted on June 10, 2021.  In making his ruling, Judge Watson told Koya's counsel (Tanaka) that a witness has no right to invoke the Fifth Amendment "on a

---

[13] The original indictment in this case was returned on June 2, 2022.  *See* ECF No. 1. The motions to compel testimony during the grand jury—a year earlier—were filed and assigned in the normal course to different district judges, and assigned the following miscellaneous case numbers:  Misc. No. 21-00098 LEK-KJM (Otani); Misc. No. 21-00111 DKW-WRP (Koya); Misc. No. 21-00260 JMS-KJM (Fujii); and Misc. No. 21-00269 LEK-KJM (Wong).

blanket basis and essentially refuse to answer even the most preliminary of questions." Gov't Ex. 9 at Tr. 5, ECF No. 288-7 at PageID.3770. He explained that "for the witness to simply say, in essence . . . I invoke the Fifth Amendment and I want to make a statement—an opening statement of sorts . . . is clearly improper." *Id*. at Tr. 6, ECF No. 288-7 at PageID.3771. Rather, he told Tanaka, "[i]t's on a question-by-question basis. That's how the invocation must be brought." *Id.* He continued:

> [the witness] must appear, he must respond to the questions that are asked, and if there are specific questions to which he maintains whatever objection he maintains, whether it's the Fifth Amendment or something else, then nothing I'm saying here precludes him from making that objection, invoking that privilege in the way he certainly already indicates he knows how. But that must be done again on a question-by-question basis.

*Id.* at Tr. 7–8, ECF No. 288-7 at PageID.3772–73.

Earlier, on March 4, 2021, grand jury witness Joann Fujii (Defendant Aaron Fujii's spouse), appeared before the grand jury and immediately invoked the Fifth Amendment, reading and repeating a statement explaining that she had a medical condition and complaining that the prosecution acted in an unsympathetic and intimidating manner and refused to tell her what the subpoena was about. *See* Gov't Ex. 4 at 5, ECF No. 288-2 at PageID.3616. She invoked the privilege to just about every question asked, refusing to answer questions such as "Are you in need

of medical attention?" and "Do you need to take a break?" *Id.* at 6, ECF No. 288-2 at PageID.3617.  This court (Judge J. Michael Seabright) granted a government motion to compel testimony of Fujii at a hearing on June 23, 2021.  *See* Gov't Ex. 9 at 32, ECF No. 288-7 at PageID.3797.  In its ruling, this court told Tanaka (as Joann Fujii's counsel), among other matters, that "[a] proper application requires that the Fifth Amendment be raised in response to specific questions," and that a witness "must have a reasonable cause to apprehend such a danger [of self-incrimination] to the question posed." *Id.* at 40, ECF No. 288-7 at PageID.3805.  The court reasoned, in part, that her "invocation [of the privilege] . . . in response to certain questions is simply absurd and abusive. . . . it seems relatively clear that she was invoking the privilege across the board [and] . . . was the equivalent of a blanket invocation." *Id.* at 42, ECF No. 288-7 at PageID.3807.  In sum, the court ordered that Joann Fujii:

> must appear before the grand jury and is ordered to answer questions, and may not invoke a blanket or the equivalent of a blanket Fifth Amendment privilege.  If she has reasonable cause to believe that an answer to a specific question would either support a criminal conviction or provide a link in the chain of that, then the privilege may be asserted.  And then if the U.S. disagrees, we can get back together.

*Id.* at 43, ECF No. 288-7 at PageID.3808.

Similarly, on April 1, 2021, grand jury witness Steven Wong (an MAI executive also represented by Tanaka), appeared before the grand jury and also

began his testimony by reading a statement invoking his Fifth Amendment right against self-incrimination against all questions, claiming that "[t]he FBI came to my home on multiple occasions in a harassing manner attempting to intimidate and put fear in myself and my family, and refused to tell me why I am here today." Gov't Ex. 3 at 72, ECF No. 288-1 at PageID.3611. He refused to answer questions such as whether he was suffering from any health conditions, how he was "terrorized" by the FBI, and where he worked. *Id.* at 19–20, ECF No. 288-1 at PageID.3558–59. At a July 14, 2021 hearing on the government's motion to compel Wong's testimony, District Judge Leslie Kobayashi asked Tanaka, given prior rulings on similar matters,

> is there any reason that you want to argue now why Mr. Wong shouldn't be compelled to attend the grand jury and to answer all questions posed to him unless and until he can establish that he has apprehension of a real danger?

Gov't Ex. 9 at 48, ECF No. 288-7 at PageID.3813. After Tanaka responded that she had nothing else to add, Judge Kobayashi compelled Wong's testimony, ruling as follows:

> Mr. Wong, you need to appear before the grand jury and you need to answer the questions that are posed, not just the 15 that was put in the opposition, but you need to answer all questions that are posed to you.
>
> If you have a real apprehension of danger from having to answer any of the specific questions, you can raise your Fifth Amendment right and we would then,

you know, presumably have a hearing with regard to
those.

*Id.*[14]

### 2.    *Otani's May 27, 2021 Grand Jury Appearance and the June 17, 2021 Order to Answer Questions*

In the midst of those proceedings, on June 17, 2021, Judge Kobayashi

also ordered Otani to appear before the grand jury and answer questions.  Like

Koya, Otani had appeared at the grand jury on May 27, 2021 (after having earlier

been ordered to appear) and immediately began her testimony by reading a long

statement making accusations about the lead prosecutor.  She concluded by stating:

> Michael Wheat has refused to tell me and others why we
> are here, what his investigation is about, and has
> repeatedly violated our constitutional rights.  Based upon
> the foregoing, I hereby invoke my Fifth Amendment
> right against self-incrimination and I therefore
> respectfully decline to answer any questions.

---

[14]  Judge Kobayashi repeated,

> Mr. Wong, please listen carefully to this part.  You are ordered that
> you may not read or otherwise make a general statement about
> invoking your Fifth Amendment right or about law enforcement.
> You must answer all questions posed to you with a response to the
> specific question, or raise your Fifth Amendment right to a specific
> question.

Gov't Ex. 9 at 49, ECF No. 288-7 at PageID.3814.  Given prior court rulings, she also told Wong
and Tanaka that if a blanket claim of Fifth Amendment privilege is again asserted, or if the
privilege was asserted in an unreasonable manner on advice of counsel, then the court would
entertain a request for sanctions.  *Id.* at 49–50, ECF No. 288-7 at PageID.3814–15.

Gov't Ex. 7 at 2, ECF No. 288-5 at PageID.3753; *see also* ECF No. 247-1 at

PageID.2262–63.  Otani then invoked her Fifth Amendment right as to almost

every question asked of her, including questions such as "Do you understand [your

rights]?," "Are you represented by counsel here today?," and "What do you do for

a living, ma'am?"  ECF No. 247-1 at PageID.2263–64.  All told, on May 27, 2021,

she was asked fifty specific questions (or sub-questions) to which she invoked the

Fifth Amendment.  As she summarizes them (and as the transcript confirms), the

questions were:

- Did you receive a subpoena to be here today?
- Do you understand [the advisement as to the Fifth Amendment right against self-incrimination]?
- Do you understand [the advisement as to the Sixth Amendment right to be represented by counsel and to consult with a lawyer in the hall or on recess]?
- Are you represented by counsel here today?
- Do you understand [the advisement as to the obligation to provide truthful, complete, and accurate information to the Grand Jury, and the potential to be prosecuted for perjury or obstruction of justice for knowingly giving materially false information]?
- Having your rights and obligations in mind, are you prepared to testify today?
- What do you do for a living, ma'am?
- How long have you done that?
- Where do you work?
- Where were you employed in 2011?
- Are you the officer of any corporation?
- Are you the representative or designated agent for any partnerships or any other business entity?
- Directing your attention to November 2, 2011, do you recall that day [the date of a purported meeting concerning L.J.M.]?
- What caused you to run construction permits for an individual by the name of [L.J.M.]?

- Do you know an individual by the name of Dennis Mitsunaga?
- How long have you known him?
- Are you a signer on any bank accounts involving Mitsunaga?
- Do you have a cell phone?
- Whose cell phone is it?
- What role did you play in an unemployment benefits hearing for an individual by the name of [L.J.M.]?
- What role did you play in a civil trial involving [L.J.M.] here in the United States District Court?
- On how many occasions did you meet with Keith Kaneshiro at the office of the Department of the Prosecuting Attorney?
- Who went to those meetings with you?
- Do you know Keith Kaneshiro?
- Ma'am, you read a speech when you came in here, did you?
- Did you prepare this [speech] yourself?
- Who assisted you in the preparation of this?
- In this document, you reference an Arnold Koya. How did you learn of the events surrounding Mr. Koya?
- Who told you that?
- Did someone help you prepare this?
- Ma'am in the last paragraph of your statement . . . in the second sentence, there, it begins "Based upon the foregoing." Do you see that?
- What does foregoing mean?
- Do you commonly use the term "foregoing"?
- Ma'am did you have a discussion on the telephone with an individual by the name of Darrin Sakanoi, an FBI agent?
- Did someone tell you to invoke your Fifth Amendment to every question?
- Do you think if you invoke your Fifth Amendment against self-incrimination that you won't have to answer any questions?
- Did you appear at a hearing before Judge Kobayashi?
- Two weeks ago, did you appear before a hearing before Judge Kobayashi?
- Did Judge Kobayashi order you to appear here today?
- How will saying whether or not Judge Kobayashi directed you to appear here before the Grand Jury today implicate you in a crime?
- Are you sick, ma'am?
- Do you need medical attention today?
- How did you get here today?

- When you received a subpoena to appear before the Grand Jury, who did you notify?
- When is the last time you had contact with Dennis Mitsunaga?
- When is the last time you had contact with Lois Mitsunaga?
- What positions have you . . . held in the Mitsunaga companies?
- Why do you think your phones are being tapped?
- Did someone tell you your phone was being tapped?
- Is it your intention to invoke your Fifth Amendment right to each and every question put to you today?

ECF No. 247 at PageID.2223–26 (citing Transcript of May 27, 2021, testimony).

The prosecution then moved on June 3, 2021, to compel Otani's testimony, and Judge Kobayashi heard that motion on June 17, 2021.  *See* ECF No. 247-5 at PageID.2427.  Judge Kobayashi granted the motion in part and denied it in part.  *See id.* at PageID.2429.  Judge Kobayashi explained that the government's motion was "granted to the extent that Ms. Otani is compelled to return to the grand jury and to answer all of the questions asked of her previously . . . on May 27, 2021."  Gov't Mot., Ex. 9 at 26, ECF No. 288-7 at PageID.3791.  She disagreed with the government that Otani made "a blanket assertion" of the Fifth Amendment privilege but, rather, "she made a specific assertion as to the questions."  *Id.* at 28, ECF No. 288-7 at PageID.3793.  But she found "that Ms. Otani ha[d] not carried her burden with regard to demonstrating that there is a risk of incrimination as to each of the questions that were asked of her."  *Id.*  She then explained that "[i]f there are additional questions, which the government is entitled

to ask, I'm not making any ruling on that because I don't know what those questions are . . . ." *Id.* at 28–29, ECF No. 288-7 at PageID.3793–94.

In a written minute order issued that same day, Judge Kobayashi memorialized her ruling, setting forth the applicable legal principle that the Fifth Amendment right is not asserted wholesale and is properly raised "in response to specific questions," ECF No. 247-5 at PageID.2428 (quoting *United States v. Tsui*, 646 F.2d 365, 367 (9th Cir. 1981)). And she repeated the well-settled law that to sustain a claim of privilege under the Fifth Amendment "it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result," *id.* (quoting *Hoffman*, 341 U.S. at 486–87), and that "a blanket refusal to answer any question is unacceptable." *Id.* (quoting *United States v. Moore*, 682 F.2d 853, 856 (9th Cir. 1982)). Further, she explained as stated at the hearing that "[t]he opposition memorandum filed on Ms. Otani's behalf on June 14, 2021 . . . fails to shed light on what potential injurious harm might result if answers to the questions posed are given." *Id.* at PageID.2429.

### 3. *Otani's Subsequent Grand Jury Testimony and Alleged Fifth Amendment Violations*

In compliance with the June 17, 2021 Order, Otani appeared before the grand jury on June 24, 2021. *See* Otani Ex. B, ECF No. 247-2. Moreover,

Otani was later recalled two other times (on July 15, 2021, and on August 26, 2021), thus making four appearances before the grand jury. *See* Otani Exs. C and D, ECF Nos. 247-3 and 247-4. On each of those occasions, the prosecution began—as the record reflects that it always did with grand jury witnesses—by telling Otani that she had a Fifth Amendment privilege, that she had a Sixth Amendment right to consult with counsel, and that she had an obligation to tell the truth. *See* Otani Ex. B at 2–4, ECF No. 247-2 at PageID.2277–79; Otani Ex. C at 3–5, ECF No. 247-3 at PageID.2329–31; Otani Ex. D at 2–5, ECF No. 247-4 at PageID.2387–90. Nevertheless, Otani had been compelled on June 17, 2021, to answer "all of the questions asked of her previously . . . on May 27, 2021." Gov't Mot., Ex. 9 at 26, ECF No. 288-7 at PageID.3791.

At that June 24, 2021 session, however, the prosecution did not re-ask all of the fifty questions it had previously asked on May 27, 2021. Some of those fifty questions were never asked again (either on July 15, 2021, or on August 26, 2021, when she made subsequent appearances before the grand jury).[15] But some of those fifty that were not asked on June 24, 2021, were asked in substantially-

---

[15] For example, it appears from the court's review that after the May 27, 2021 hearing, the government at the grand jury never again asked these questions: (1) "What role did you play in an unemployment benefits hearing for an individual by the name of [L.J.M.]," ECF No. 247-1 at PageID.2266; (2) "On how many occasions did you meet with Keith Kaneshiro at the office of the Department of the Prosecuting Attorney?," *id.* at PageID.2266–67; "Who went with you to those meetings with Keith Kaneshiro?," *id.* at PageID.2267; and "When is the last time you had contact with Dennis Mitsunaga?," *id.* at PageID.2271. There may be others.

similar form on either July 15, 2021 or on August 26, 2021.[16]  Some (whether re-asked on June 24, 2021 or at either of the other sessions) clearly presented no possibility of self-incrimination.[17]  And, in context under *Hoffman*, a privilege might have been proper as to some that were re-asked.[18]  Further, the prosecution asked other questions—i.e., besides the fifty at issue in the June 17, 2021 Order.[19]  Otani answered most of those new questions, but she invoked a Fifth Amendment privilege several times on August 26, 2021, when asked questions about her role in obtaining a check "payable to Kaneshiro for Prosecutor," ECF No. 247-4 at PageID.2404, and questions about relatives or contributors, *id.* at PageID.2400, 2406–07.

  Of those categories of questions, the court is only concerned with the fifty questions from May 27, 2021, that the prosecution re-asked Otani at any

---

[16]  For example, she was asked on July 15, 2021 (but not on June 24, 2021): (1) "Directing your attention to November 2nd, 2011, do you recall that day?," ECF No. 247-1 at PageID.2265; (2) "What caused you to run construction permits for an individual by the name of [L.J.M.]?," *id.*; and (3) [D]id you have a discussion on the telephone with an individual by the name of Darrin Sakanoi, an FBI agent?," *id.* at PageID.2269.

[17]  For example, (1) "Do you understand [your Fifth Amendment right]?, ECF No. 247-1 at PageID.2263, and (2) "Do you have a cell phone?," *id.* at PageID.2266.

[18]  For example, "What caused you to run construction permits for an individual by the name of [L.J.M.]?," ECF No. 247-1 at PageID.2265, and (2) "Are you a signer on any bank accounts involving Mitsunaga?," *id.* at PageID.2266.

[19]  For example, on July 15, 2021, she was asked new questions (1) about out-of-state travel to Las Vegas, ECF No. 247-2 at PageID.2289–91; and (2) political contributions, *see, e.g.*, *id.* at PageID.2288–90, 2295–96.

subsequent grand jury proceeding.  If Otani had asserted a Fifth Amendment

privilege as to any of those fifty particular questions, she would have been at risk

of being held in contempt of the June 17, 2021 Order.  True, the June 17, 2021

Order had reasoned that Otani had "not carried her burden with regard to

demonstrating that there is a risk of incrimination as to each of [those] questions,"

ECF No. 288-7 at PageID.3791, and that Otani's "opposition memorandum . . .

fail[ed] to shed light on what potential injurious harm might result," ECF No. 247-

5 at PageID.2429, from answering the questions.  And it's also true that Tanaka

had been told at least twice before the June 24, 2021 testimony (and at least twice

more after June 24, 2021, but before Otani's subsequent testimony on July 15,

2021, and August 26, 2021) that the Fifth Amendment privilege could be invoked

on a question-by-question basis.  *See* Gov't Ex. 9 at Tr. 7–8, ECF No. 288-7 at

3772–73; ECF No. 247-5 at PageID.2428.  Nevertheless, it appears that Otani was

not given a full opportunity to invoke the privilege on an individual-question basis

prior to the June 17, 2021 Order.[20]  Given this fact, the court orders suppression of

the answers to any of those fifty questions that were re-asked by the prosecution at

a grand jury session (and to which there is a reasonable basis to assert a Fifth

---

[20]  At the June 17, 2021 hearing, Otani conceded that she would not raise a privilege as to certain questions, and the government indicated it was ready to "address the particular questions that she intends to invoke so that we can . . . get a ruling on those so we don't have to come back before the Court again."  Gov't Ex. 9 at Tr. 13, ECF No. 288-7 at PageID.3791.

Amendment privilege). *See, e.g.*, *Lujan v. Garcia*, 734 F.3d 917, 926–27 (9th Cir. 2013) (reiterating that statements must be excluded from further proceedings when given in violation of the Fifth Amendment) (citing *Harrison v. United States*, 392 U.S. 219, 222–24 (1968)).

   The court will not, however, suppress answers Otani gave to any other questions that were asked at the other grand jury sessions (that is, questions other than the fifty asked on May 27, 2021). The court is not convinced by Otani's argument that "[t]hese additional questions [after May 27, 2021] . . . should also be treated as compelled due to the cumulative effect of the environment in which Judge Kobayashi's [June 17, 2021] Order put Ms. Otani." ECF No. 247 at PageID.2254. The court disagrees with the argument that Otani was "chilled from invoking her Fifth Amendment right to other questions asked of her." *Id.* Judge Kobayashi made clear at the hearing that her ruling was limited to those fifty questions, and she was "not making any ruling" on any additional questions. Gov't Mot., Ex. 9 at 28–29, ECF No. 288-7 at PageID.3793–94. The "cumulative effect of the environment" in which various MAI witnesses were compelled to testify— given the repeated explanations of how and how not to invoke the Fifth Amendment—actually demonstrates that Otani must have known that (as her counsel had repeatedly been told) she could invoke the privilege on a question-by-question basis as to any questions besides the fifty at issue in the June 17, 2021

Order.  And, in fact, she did invoke the Fifth Amendment to several questions on

August 26, 2021.  *See* ECF No. 247-4 at PageID.2400–07.  That is, she was not

"compelled" to answer the new questions.  *See, e.g.*, *United States v. Wells*, 55

F.4th 784, 792 (9th Cir. 2022) ("Normally, if a person 'desires the protection of the

privilege, [she] must claim it or [she] will not be considered to have been

"compelled" within the meaning of the Amendment.'") (quoting *Minnesota v.

Murphy*, 465 U.S. 420, 427 (1984)); *id.* ("The Fifth Amendment also does not

apply to 'voluntary' statements, or in situations when 'a person does not invoke the

privilege against self-incrimination and any pressure to make incriminating

statements does not rise to the level of compulsion.'") (quoting *Chavez v.

Robinson*, 12 F.4th 978, 987 (9th Cir. 2021)).

        And to be clear, although the court will suppress answers to certain of

the fifty questions at issue in the June 17, 2021 Order, the court finds no reason to

dismiss the FSI, much less any prosecutorial misconduct in any violations of

Otani's Fifth Amendment rights.  Moreover, for the reasons stated above, it finds

no misconduct in failing to name Otani as a target of the investigation earlier.  As

with Mitsunaga's argument, the court is not convinced by the Defendants' alleged

violations of the United States Attorneys' Manual.  *See Goodwin*, 57 F.3d at 818.

Nor does the court find anything prejudicial about the prosecution's or grand jury's

taking of Otani's notes as a grand jury exhibit at the end of the August 26, 2021 session.

At the November 7, 2023 hearing, the court asked Otani's and government counsel—assuming that the court found a potential Fifth Amendment violation because there should have been a question-by-question analysis of the fifty questions asked on May 27, 2021—if counsel would consider meeting and conferring as to which of Otani's answers to the fifty questions should be suppressed.  *See* ECF No. 314 at PageID.5925–26.  The government agreed with such an approach, as did Otani's counsel (as alternative relief to what she was seeking).  *See id.* at PageID.5926, 5928.  Given the court's reasoning here, the court will order as it indicated at the hearing.  That is, rather than asking the parties now for briefing on a question-by-question basis—especially where some questions were not re-asked, some questions were clearly not subject to a privilege, and some questions resulted in seemingly innocuous answers—the court orders the government and counsel for Otani to meet and confer to attempt to agree on which of Otani's answers should be suppressed.

Further, at this time, the court need not rule as to the need for any proceedings based on the rationale of *United States v. Kastigar*, 406 U.S. 441 (1972).  The court anticipates that Otani's answers to, at most, only a few questions might be at issue.  If the parties are unable to agree, and they need to submit those

questions to the court for specific rulings (whether relating to suppression or the need for a *Kastigar*-type hearing), they may do so after meeting and conferring. The court will allow until **December 22, 2023**, for the parties to meet and confer and submit a list of evidence to be suppressed and, only if necessary, to submit an appropriate motion asking the court to review specific questions, or to address whether the rationale of *Kastigar* is implicated in any way as to those questions and answers.  In that regard, Otani's Motion is GRANTED.  In all other respects it is DENIED.

## IV.  CONCLUSION

For the foregoing reasons, the court (1) DENIES Defendant Dennis Mitsunaga's Amended Motion to Dismiss, ECF No. 273, and related Joinders, ECF Nos. 228, 276, 279, 282, 309; (2) GRANTS IN PART and DENIES IN PART Defendant Terri Otani's Motion to Dismiss, ECF No. 247; (3) DENIES Defendant Mitsunaga's Motion to Compel Discovery, ECF No. 299; and (4) DENIES

///

///

///

///

///

///

Defendant Mitsunaga's Motion for Rule 17(c) Subpoena, ECF No. 300.

Counsel for Otani and the government are to meet and confer, and have until **December 22, 2023**, to notify the court regarding suppression or *Kastigar*-type proceedings as set forth above.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, December 8, 2023.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*United States v. Kaneshiro et al.*, Cr. No. 22-00048 JMS-WRP, Order (1) Denying Defendant Dennis Mitsunaga's Amended Motion to Dismiss, ECF No. 273, and Related Joinders, ECF Nos. 228, 276, 279, 282, 309; (2) Granting In Part And Denying In Part Defendant Terri Otani's Motion To Dismiss, ECF No. 247; (3) Denying Defendant Mitsunaga's Motion To Compel Discovery, ECF No. 299; and (4) Denying Defendant Mitsunaga's Motion For Rule 17(c) Subpoena, ECF No. 300